# Illinois Official Reports

## Appellate Court

---

### *People v. Gold-Smith*, 2019 IL App (3d) 160665

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT GOLD-SMITH, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-16-0665 |
| Filed | October 22, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 12-CF-2338; the Hon. Daniel J. Rozak, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Emily A. Koza, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion.<br>Justices Lytton and Wright concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a bench trial, the defendant, Robert Gold-Smith, was found guilty of solicitation of murder for hire (720 ILCS 5/8-1.2(a) (West 2012)) and solicitation of murder (720 ILCS 5/8-1(b) (West 2012)) and was sentenced to 30 years in prison on the solicitation of murder for hire conviction. On appeal, he argues, *inter alia*, that (1) the State failed to prove him guilty beyond a reasonable doubt of solicitation of murder for hire and (2) the circuit court erred when it struck his motion for substitution of judge that was filed within 10 days of the case being assigned to Judge Rozak. We reverse and remand.

¶ 2                                I. BACKGROUND

¶ 3    On October 11, 2012, attorney Robert Gold-Smith was charged by indictment with solicitation of murder for hire (720 ILCS 5/8-1.2(a) (West 2012)) and solicitation of murder (720 ILCS 5/8-1(b) (West 2012)). The indictment alleged that Gold-Smith solicited Brian McDaniel to kill Gold-Smith's wife, Victoria Smith, in exchange for money. Gold-Smith and McDaniel were fellow inmates in the Will County Adult Detention Center at the time of the alleged solicitation, and the conversation was recorded by a wire worn by McDaniel.

¶ 4    At the time the indictment was returned, Gold-Smith was facing charges for aggravated battery, which stemmed from an incident in which he assaulted Victoria in court after a proceeding on their pending divorce, allegedly punching her in the face several times. One of the police officers who helped restrain him heard Gold-Smith exclaim that Victoria "was messing with him and that he wished he would have did [*sic*] more to her." That case was assigned to Judge Rozak.

¶ 5    On October 17, 2012, the instant case was also assigned to Judge Rozak. While in court that day, Gold-Smith requested his public defender to withdraw so he could proceed *pro se* until he could hire private counsel. Gold-Smith explained that the public defender had refused to file a motion for substitution of judge, so he believed he was forced to request the withdrawal so he could file the motion *pro se*. Judge Rozak expressed concern that Gold-Smith, himself, was attempting to abuse the right to proceed *pro se* by discharging his public defender, filing the motion the public defender did not want to file, and then seeking reappointment of the public defender. Judge Rozak was also concerned that Gold-Smith might inform other inmates that they could use the same ploy to avoid being tried by him. In response to Gold-Smith's assertion that he had a right to file a motion for substitution of judge, Judge Rozak stated, "[i]t is your attorney's right to do that." Judge Rozak denied the motion and continued as the presiding judge on the case.

¶ 6    Nine days later, Gold-Smith attempted to file a *pro se* motion for substitution of judge, alleging that Judge Rozak was biased against him. Judge Rozak struck the motion.

¶ 7    After numerous continuances over the next two-plus years, Gold-Smith was eventually allowed to proceed *pro se* in January 2015. Subsequently, he filed several motions, one of which was a motion to dismiss the indictment. That motion alleged that McDaniel lied about having the solicitation conversation with Gold-Smith and that McDaniel actually fabricated the conversation by providing both his own voice and the whispering voice that he was attributing to Gold-Smith.

¶ 8        During the hearing on the motion to dismiss, several witnesses testified. Another fellow inmate of Gold-Smith, Bradley Schlott, testified that in the fall of 2012 (*i.e.*, at the time of the conversation recorded by McDaniel's wire), he was living in the Will County Adult Detention Facility's "B pod" with Gold-Smith. On one day in September 2012, Schlott worked a shift for McDaniel's coworker, who missed the shift while he was in court. The work was done in "A pod," where McDaniel was living. During the shift, McDaniel informed Schlott that he wanted to get moved back to "B pod," where he had previously been living. McDaniel stated that "he had some things that he wanted to do with [Gold-Smith]." Schlott testified that McDaniel also said several times that he was going to get his case dropped and that he was going to be released soon, which Schlott did not believe due to McDaniel's extensive criminal history, including violent acts. Schlott testified that he suspected McDaniel was serving as a snitch.

¶ 9        Sometime later, Gold-Smith and Schlott were having a conversation and Gold-Smith stated that McDaniel had been asking him some strange questions. Schlott told Gold-Smith about the conversation he had with McDaniel during the aforementioned work shift and further told Gold-Smith to avoid McDaniel because he might be wearing a wire.

¶ 10       Schlott further testified that, subsequently, McDaniel was transferred to "B pod." On one evening in the fall, several days after that transfer, Gold-Smith, Schlott, and fellow inmate Darrell[1] Stephenson were seated in the common area of "B pod" watching television. McDaniel was seated in a chair behind them. Gold-Smith never left his chair, but on several occasions, McDaniel got up, walked over by the pay phones, and returned to his chair. At one point, while seated in his chair, McDaniel appeared to be talking and whispering to himself. At another point, McDaniel got up and walked to his cell. Schlott stated that it appeared to him that McDaniel was talking to himself. Subsequently, a lockdown was called in the facility, and everyone returned to their cells. McDaniel was taken from "B pod," and they never saw him in that section of the jail again.

¶ 11       Schlott also testified that 46 people lived in "B pod" and there may have been several other people in the general vicinity at the time of these events.

¶ 12       Ultimately, the circuit court denied the motion to dismiss, ruling that the case turned on witness credibility issues, which were questions for the fact finder to decide.

¶ 13       Gold-Smith represented himself at his bench trial, which began on January 19, 2016. The State called several witnesses, but the State's case was predicated in large part on the recording from the wire worn by McDaniel. During that recording, McDaniel asked several questions regarding whether "he" wanted McDaniel to kill "her," whether "he" agreed to pay McDaniel $5000 for killing "her," and whether "he" would call his power of attorney to ensure that the funds would be transferred. A voice attributed to Gold-Smith by the State whispered in reply, *inter alia*, that he wanted "the b***" killed and answering in the affirmative that McDaniel would get $5000 for killing "her."

¶ 14       The parties stipulated that three people, if called as witnesses, would all testify that Gold-Smith approached them between April and August 2011 and solicited them to kill Victoria. The three individuals all reported their allegations to the police, but no charges were ever filed against Gold-Smith as a result. While he stipulated to the content of the putative

_____

[1]Stephenson's first name was transcribed as Darrell during the hearing on the motion to dismiss the indictment. It was transcribed as Darryl during Gold-Smith's trial. It was also transcribed as Daryl during the hearing on the motion to reopen the proofs.

witnesses' testimony, Gold-Smith also denied its truthfulness, asserting that he never tried to solicit those individuals to kill Victoria.

¶ 15    McDaniel testified that, at the time of trial, he was incarcerated on two separate retail theft incidents. At the time he had worn the wire, he had been incarcerated in the Will County Adult Detention Facility on a felony aggravated battery charge for which, if convicted, he was facing an extended term of 2-10 years. While there, he met Gold-Smith. During their conversations, Gold-Smith made it evident that he was mad at his wife and that he wanted her killed. McDaniel stated:

> "Well, at first I thought maybe he was just venting, and then it became serious. I knew he was serious about wanting to hurt her. At first he just wanted to hurt her like slice her face or—so how he put it, so she—every time she looked in the mirror, she would remember him and then he kept switching up: Throw some acid at her. Just crazy stuff.

* * *

> Acid in her face or a can of—he had a can of gas that you would light and throw on. Just crazy, heinous stuff and then he's just like, just—he just wanted her dead."

Initially, McDaniel did not want anything to do with the situation, but later he felt he needed to intervene due to the danger Victoria was in. Eventually, McDaniel said that he told his attorney about it and that he was later approached by some police officers who asked him if he would wear a wire. McDaniel agreed.

¶ 16    On October 3, 2012, McDaniel was taken from "B pod" for a fictitious reason and was fitted with a wire. The officers told him they would be listening the entire time. He was taken back to his cell, and the prisoners were given break time a few minutes thereafter. McDaniel said that he had a conversation with Gold-Smith by the pay phones in the common area. Both of them grabbed a phone. Due to the close proximity between the phones and the short phone cords, users could not stand square to the wall; either one or both had to turn sideways. McDaniel asked questions of Gold-Smith, who responded in whispers that he wanted McDaniel to kill Victoria. Further, McDaniel testified:

> "He said he was going to give me $5,000. How I was going to get it became an issue. He said he had somebody—he had a power of attorney that once he saw that it was done in the paper or something, he would have—I think he said it was his uncle would give me the money. He knew I was getting out soon."

Eventually, McDaniel returned to his cell and said that if the officers were listening and had enough information, they should call for a lockdown. Shortly thereafter, a lockdown was called, and McDaniel was escorted out of "B pod."

¶ 17    McDaniel testified that he was not promised anything specific in exchange for wearing the wire, but he knew that he was going to receive some reward for doing so. He stated that his felony aggravated battery charge was reduced to a misdemeanor because he wore the wire, and he was eventually conditionally released from jail. He was also given some phone cards and a $100 commissary credit for wearing the wire. But the cards did not work, and his commissary credit was somehow lost between his transfer out of the Will County Adult Detention Facility and to Kankakee County. Although he denied Sergeant Vincent Perillo, who was one of the officers involved with the wire-wearing agreement, had made promises to him for wearing the wire, he did write the sergeant a letter asking him to make good on his "promise" to replace the

cards and fix the commissary issue. McDaniel also received a $1000 CrimeStoppers reward shortly after he wore the wire and was released from jail. In addition, he testified that he did not have all of the information needed to carry out the killing because he never intended to do it.

¶ 18 Julio Centeno testified that he had been friends with Gold-Smith for over 10 years and that Gold-Smith had reached out to him to contact McDaniel after the solicitation charges had been filed. Gold-Smith wanted Centeno to see if McDaniel would be willing to recant his story. Subsequently, Centeno talked to McDaniel on the phone four times. On one of those occasions, he asked McDaniel if he would be willing to sign a recantation statement. McDaniel requested $8000 to sign the document. Centeno declined. Later, during the last phone call, McDaniel told Centeno to send him the document because he was willing to sign it. Centeno also testified that he had been convicted of robbery in 1988.

¶ 19 Gold-Smith proceeded under a theory that McDaniel had fabricated the conversation recorded by the wire and that the whispering voice on the recording was not his. Gold-Smith attacked McDaniel's credibility and presented several lay witnesses who testified that the whispering voice in the recording did not sound like Gold-Smith.

¶ 20 The parties stipulated that Bradley Schlott would testify in accord with his testimony from the hearing on Gold-Smith's motion to dismiss the indictment. Gold-Smith also called fellow inmates Stephenson and Jason Gonzalez. Like Schlott, Stephenson testified that he did not see Gold-Smith get up from his chair at all during that period in the common area on October 3, while McDaniel got up from his chair and came back several times. Gonzalez testified that McDaniel told him on October 1, 2012, of the plan to wear a wire and of his intent to fabricate a conversation if Gold-Smith would not talk. Gonzalez also stated that he warned Gold-Smith of McDaniel's plan.

¶ 21 Gold-Smith testified that he never had any conversation with McDaniel about murdering Victoria. He stated that he did not have $5000. He stated that before he was incarcerated, he gave his uncle $20,000 to pay his bills for him until he was released. However, that money was eventually depleted due to substantial attorney fees. Gold-Smith further claimed that he was on alert that McDaniel could have been wearing a wire due to conversations he had with fellow inmates, as well as his own observations of McDaniel's strange behavior. He stated that he, Schlott, and Stephenson had agreed to stick together on October 3, 2012, due to their suspicions.

¶ 22 Numerous exhibits were entered into evidence during the trial, including a surveillance video of the common area from "B pod" at the time that the solicitation conversation allegedly took place. Gold-Smith explained that he wanted the video introduced for the limited purpose of showing when McDaniel entered "B pod" (6:45 p.m.) and when he left (around 7:45 or 7:50 p.m.). He said that their recreation time started at 7:10 p.m. and "from that point on everything [in the video] is pretty much useless." The State had no objection because "[a]s Mr. Gold-Smith explains, the real meat of what the case is is not recorded on that camera."

¶ 23 When the case was initially scheduled for decision, the circuit court asked for an explanation of the video's evidentiary purpose. Gold-Smith reiterated the limited purpose for which he offered the video. The court stated that there was no identification of McDaniel on the video, which merely showed "a number of people milling around most on the first floor, a few on the second floor, and [did not tell the court] anything." Gold-Smith then stated he would be willing to withdraw the video, but the court stated, "[i]t's already in evidence and I

already looked at it. So if nobody wants to answer the questions [about which person was McDaniel and what time he entered and left], that's fine with me, you don't have to."

¶ 24 Several days later, the circuit court announced its decision regarding the bench trial. The court emphasized, *inter alia*, that it spent a great deal of time painstakingly reviewing the recording from McDaniel's wire. Ultimately, the court found Gold-Smith guilty on both counts and sentenced him to 30 years of imprisonment for solicitation of murder for hire. After his motion to reconsider sentence was denied, Gold-Smith appealed.

¶ 25 II. ANALYSIS

¶ 26 Gold-Smith raises two issues in this appeal. The first asserts that the circuit court erred when it found him guilty of solicitation of murder for hire, essentially arguing that there was insufficient evidence of guilt because McDaniel's testimony was inconsistent with the recording from the wire, undercutting his credibility as a witness. He contends the State's evidence was, therefore, insufficient to support a finding of guilt. The second issue claims error in the trial court's striking of his motion for substitution of judge, which was fully compliant with the requirements of the statute. We consider these issues in reverse order of their presentation.

¶ 27 A. Substitution of Judge

¶ 28 Gold-Smith argues that the circuit court erred when it struck his motion for substitution of judge, as it met all of the requirements of section 114-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-5(a) (West 2012)), including that it was brought within 10 days of the case being assigned to Judge Rozak. That statute provides in pertinent part:

> "§ 114-5. Substitution of judge. (a) Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The defendant may name only one judge as prejudiced, pursuant to this subsection; ***." 725 ILCS 5/114-5(a) (West 2012).

The State does not dispute that the motion satisfied these statutory requirements, responding instead that the motion was properly stricken because Gold-Smith was represented by counsel at the time and was precluded from *pro se* filings. Gold-Smith replies that the only reason the motion was filed *pro se* was due to Judge Rozak improperly denying his previous motion to proceed *pro se* so he could file the motion for substitution that his attorney refused to file.

¶ 29 The statute's plain language gives "defendant" an absolute right to one substitution of judge based on nothing more than an uncontestable allegation of prejudice. The right belongs to the defendant, not to defense counsel, and the statute makes no provision for a hearing; rather it requires the court to transfer the case to another judge upon receipt of defendant's request. Here, defense counsel and the court placed themselves squarely between defendant and his unconditional statutory right to obtain a substitute for Judge Rozak, leaving defendant no alternative but to find other counsel within his limited time frame or proceed *pro se*.

¶ 30 Regarding the right of self-representation, a different panel of this court has stated:

"As a general rule, a criminal defendant has a constitutional right to represent himself if he makes an unequivocal request to do so. [Citations.] However, the right of self-representation is not absolute and may be forfeited if the defendant engages in serious and obstructionist misconduct, or if he cannot make a knowing and intelligent waiver of counsel. [Citation.] On review, the trial court's decision on a defendant's election to represent himself will be reversed only if the court abused its discretion. [Citation.]" *People v. Rohlfs*, 368 Ill. App. 3d 540, 544-45 (2006).

¶ 31 The record reveals that Gold-Smith's election to proceed *pro se* was not a part of serious and obstructionist misconduct. In fact, he asserted that right simply because his appointed counsel would not file a motion to secure a substitution of judge to which his client was statutorily entitled as of right. While Judge Rozak expressed concern that Gold-Smith was attempting to abuse the substitution process by seeking to discharge his appointed counsel just for a few days before he would reapply for appointed counsel, Gold-Smith stated prior to Judge Rozak's comment that he actually wished to retain private counsel. Under these circumstances, we hold that it was an abuse of discretion to deny Gold-Smith's October 17, 2012, motion to proceed *pro se*. That error requires that his two convictions and his sentence be vacated. See, *e.g.*, *People v. Ward*, 208 Ill. App. 3d 1073, 1085 (1991).

¶ 32                              B. Sufficiency of the Evidence
¶ 33 In light of the foregoing decision, we review the evidence in the case to determine only whether it is sufficient to permit retrial of this defendant without violation of principles of double jeopardy. *People v. Drake*, 2019 IL 123734, ¶ 29; *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 34 Our review of the record reveals that the evidence is such that a reasonable finder of fact *could* find Gold-Smith guilty of solicitation of murder beyond a reasonable doubt. In reaching that conclusion, we express no opinion as to whether or not he is guilty of the charged offenses and find only that principles of double jeopardy would not preclude retrial in this matter if deemed appropriate.

¶ 35                                      III. CONCLUSION
¶ 36 The judgment of the circuit court of Will County is reversed and the cause is remanded for further proceedings.

¶ 37     Reversed and remanded.