**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190288-U

Order filed October 27, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0288 Circuit No. 16-CF-728 |
| | ) | |
| JESUS A. LAROSA, | ) ) | Honorable Sarah F. Jones, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court.
Justices O'Brien and Wright concurred in the judgment.
Justice O'Brien also specially concurred.

_____

**ORDER**

¶ 1      *Held*:   (1) Trial court erred in denying defendant's motion to suppress the statements he made during his custodial interrogation where defendant invoked his right to counsel and his subsequent waiver was involuntary. Based on the evidence presented to the jury, the error was not harmless and a new trial is required.

¶ 2      Following a jury trial, defendant, Jesus A. LaRosa, was convicted of three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2014)) and sentenced to life in prison. He appeals, arguing that: (1) the trial court erred in denying his motion to suppress statements he made

to detectives during his interrogation; (2) the trial court erred in striking his *pro se* motion for substitution of judge as a matter of right; (3) the trial court erred in sustaining the State's objections to defense counsel's statements during closing argument; and (4) two of his three convictions for first degree murder should be vacated under one-act, one-crime principles. We find the first issue dispositive and reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4        In the spring of 2014, Hilton, a retired Ford employee, attended monthly meetings at the local Ford union hall where defendant, Shanshana Offett (Shana), and Shana's brother, Brandon Offett, worked. Hilton was known as "the popcorn man" because he ran the popcorn machine during the meetings. He frequently discussed his financial status and success with other retirees, and he enjoyed sharing pictures of his house and the improvements he made to it with those in attendance. The last meeting he attended was on May 7, 2014. On Sunday, May 13, 2014, Hilton failed to attend a weekly church dinner. A friend went to his house and called police when he did not answer the door. The fire department arrived and found Hilton deceased. His body was lying face down on the kitchen floor in a pool of blood with a phone cord wrapped tightly around his neck. He had suffered multiple fractures to the head and face as a result of blunt force trauma. Two flat screen televisions (TVs) were missing from the home. Evidence also indicated that someone attempted to unlock a safe in the basement but did not succeed.

¶ 5        On February 5, 2015, police executed a search warrant for the home of Joshua Fisher. As a result of the search, Fisher was charged with several counts of unlawful possession with intent to deliver a controlled substance and unlawful possession of a weapon by a felon. During his arrest, Fisher indicated that he had information about a friend, "Jesus (Tony) LaRosa," who committed a homicide. He told police that in May 2014 defendant told him that knew an "old man" with $30,000 to $40,000 in a safe and that he planned to rob him. Fisher later saw a report on the news

that someone murdered the man. When he asked defendant about the murder, defendant said that he "popped" Hilton and took some flat screen TVs from his house.

¶ 6     Detectives interviewed several individuals, including defendant, Shana, and Brandon, at the Will County sheriff's department. Defendant was delivered to the department from the Pontiac Correctional Facility around 10:30 a.m. on March 2, 2015. Detectives questioned defendant for several hours, during which he denied any involvement in the murder. Defendant remained in the interview room while detectives interviewed other witnesses and was remanded to Department of Corrections (DOC) custody the next day, approximately 29 hours after his interrogation began. Weeks later, police arrested defendant and charged him with three counts of first degree murder.

¶ 7     Prior to trial, defendant filed a motion to suppress the statements he made on March 2. Defendant maintained that his statements were inadmissible at trial because (1) he invoked his right to counsel multiple times during the interrogation but detectives continued to question him, and (2) his subsequent statements were coerced.

¶ 8     At the hearing, the State called Detective Jeffery Grozik. Grozik testified that he interviewed defendant, along with Detective Thomas Omiecinski, and that the entire interview was videotaped. The State then introduced the video recording for the court to consider. The video depicts defendant in the interview room from 10:37 a.m. on March 2, 2015, to 7:30 a.m. on March 3, 2015, and includes several conversations with defendant and detectives between the hours of 10:39 a.m. and 11:25 p.m. on March 2.

¶ 9     During the first conversation at 10:39 a.m., defendant provides his name and contact information. He then informs the detectives that he is in DOC custody on a parole violation. Grozik shows defendant a writ remanding him to their custody and says he will go over it "in a minute." Defendant asks, "Why was I turned over to you?" Grozik says that they will talk about it. At 10:57

3

a.m., defendant asks, "Do I get to speak to an attorney or something because, like, right now nobody's tellin' me nothin'?" Grozik responds by saying he will explain that and then leaves the room.

¶ 10    At 11:04 a.m., Grozik returns with coffee for defendant and reads defendant his *Miranda* rights. Defendant acknowledges his rights and begins discussing the case with the detectives without requesting an attorney. Grozik informs defendant that he is going to ask him some questions about "the popcorn man," and the circumstances surrounding his death. He asks defendant if he knew Hilton from the union hall where defendant worked. Defendant admits that he knew Hilton but states that he never talked to him and did not know where he lived.

¶ 11    At 11:33 a.m., Grozik asks defendant to consent to DNA and fingerprint testing. Defendant responds, "I need a lawyer, though, for all that stuff." Defendant then explains that he has served a prison term in another case for a crime that he did not commit and that he "should have taken the stand" in that case. He continues to discuss the prior case with the detectives for several minutes, after which the detectives leave the room.

¶ 12    At 12:04 p.m., Grozik and Omiecinski return. Grozik states, " I forgot to ask you about Shanshana. How do you know Shanshana?" Defendant states that he and Shana dated for a while but were no longer together. Grozik asks whether defendant gave a TV to his son. Defendant replies, "No, sir." The detectives then explain that both Shana and defendant's son told investigators that defendant gave his son a TV and that the detectives have determined that the TV belonged to Hilton. Defendant again denies giving a TV to his son. Grozik accuses defendant of lying. Defendant continues to claim that he does not own a TV, that he did not give his son a TV, and denies any involvement in Hilton's death.

¶ 13    At 12:11 p.m., Grozik informs defendant that he asked him to submit to DNA testing because investigators have recovered DNA evidence from the scene. The following discussion occurs:

> "DEFENDANT: Naw, yous [*sic*] are tricking me.
>
> DETECTIVE GROZIK: Tony, I'm not tricking you.
>
> DEFENDANT: I need to see a lawyer because—
>
> DETECTIVE GROZIK: Tony, I'm not. Tony, you need to listen to me because—
>
> DEFENDANT: I need to see a lawyer, please.
>
> DETECTIVE GROZIK: Alright, we have a search warrant for your DNA, okay Tony? This is not a game, okay? This is your life, okay? Now if you went there to try to rob the place, and Mr. Hilton—
>
> DEFENDANT: I understand—
>
> DETECTIVE GROZIK: Listen to me, listen to me.
>
> DEFENDANT:  Yes, sir.
>
> DETECTIVE GROZIK: If you went there to rob the place, and Mr. Hilton walked in on you, and you got into a confrontation, that's one thing, okay? [Voice raised.] Or if you went there to brutally murder Mr. Hilton, then you need to be honest!
>
> DEFENDANT: I'm being honest with you, sir. I don't know who's putting—
>
> DETECTIVE GROZIK: [Voice raised.] This is your life! Tony. Tony! Tony, this is your life. This is your life, Tony."

A deputy then enters the room and executes a search warrant for defendant's DNA and fingerprints. Grozik gives defendant a copy of the warrant complaint containing information regarding the details of the investigation. He suggests that defendant read it, and he leaves the room.

¶ 14 Defendant is depicted alone in the room for the next two hours. He reads the complaint several times, eats lunch, and sleeps. While reading the complaint, he frequently rubs his face, shakes his head, and mumbles to himself. At one point, an officer enters the room and defendant asks, "Do I get a phone call?" The officer responds, "Not now." At 2:03 p.m., defendant returns from the restroom and asks the escorting officer, "Do I get a State's Attorney?" The officer informs defendant that he will not be given the opportunity to talk to the State's Attorney. Defendant then states that he would like to talk to the detectives. He points to the documents on the table and says, "There's a puzzle here that I need to talk to them about." The officer explains that he cannot discuss the case with defendant because defendant asked for an attorney and that if he wants his questions answered, defendant needs to reinitiate the conversation with Grozik and Omiecinski by waiving his right to counsel. Defendant then indicates that he would like to talk to the detectives and asks for permission to speak to them. The officer responds, "Okay, let me go get the detectives."

¶ 15 Grozik enters the room a few minutes later and asks defendant, "Earlier, I read you your rights, right, and you understand that, and now you want to talk to me again?" Defendant states that he understands, and says, "I know I'm going to prison, probably for the rest of my life, or whatever." He admits that he is going to prison for being "an accessory," but states that he wants the detectives to know what happened. During the next nine hours, Grozik and Omiecinski question defendant in 20-minute intervals, leaving defendant alone for an hour or two at a time, with the final interview lasting approximately two hours. Defendant claims that Shana and Brandon committed the murder and urges the detectives to talk to both of them. He admits that he

6

sold Hilton's TV to his son for $100 but denies any involvement in Hilton's death. Defendant is provided food and water as the interview is conducted.

¶ 16    At 11:34 p.m., defendant is given a mattress and sleeps for several hours. He awakes around 7:30 a.m. and is escorted to the restroom. The video ends, and he is released several hours later.

¶ 17    The trial court denied defendant's motion to suppress. The court reviewed the video and found no fifth amendment violation, concluding that (1) defendant initially assented to speak to officers after he was given *Miranda* warnings; (2) he invoked his right to counsel at 11:33 a.m. regarding the search warrant, but the warrant was not an incriminating statement; and (3) although he invoked his right to counsel at 12:11 p.m., he reinitiated discussions with detectives two hours later, voluntarily waiving his right to an attorney.

¶ 18    At trial, officers and investigators testified that they found blood on the wall and the floor in Hilton's kitchen. The cord on the landline telephone had been removed and used to strangle Hilton. It was wrapped around his neck and covered in blood. There were partial bloody footprints next to Hilton's body that were tested but found to be inconclusive. A flat screen TV was missing from the fireplace in the living room and the mounting brackets were still hanging on the wall. Another TV had been taken from one of the bedrooms. They also observed a broken flip phone in the bathroom toilet. In the basement, investigators found part of one wall torn apart. The paneling on the wall had been ripped away and behind it was an unopened safe. Blood on the floor near the safe indicated a struggle. Inside the safe, police found $11,000 in cash, jewelry, and other personal items.

¶ 19    The kitchen and basement were swabbed for fingerprints and DNA evidence. Forensic scientist Barry Adams testified that, although latent fingerprint evidence suitable for comparison was recovered from the scene, he did not find defendant's fingerprints or palm prints on any of the

items. Sarah Owen, a forensic scientist who specializes in DNA analysis, testified that she received buccal standards from Hilton, defendant, Shana, and Brandon and compared those to buccal swabs collected from blood stains at the scene. Hilton's DNA matched several samples that were collected. Defendant's DNA was not found on any of the items she tested.

¶ 20    Fisher testified that in May 2014 defendant told him that he was going to burglarize an "old man" who lived in a country house near Crete, and he showed Fisher a picture of the house. Defendant said the man had a safe and a lot of money. A few weeks later, Fisher saw the house on the news and learned that the man who lived there had been murdered. He called defendant and asked him about it, but defendant said he had nothing to do with Hilton's death. Defendant said that Shana's brother, Brandon, killed Hilton. Fisher testified that at some later date defendant told him that he killed Hilton. Defendant told him that he went to Hilton's house to "check it out," and the door was unlocked. While he was looking around inside the house, the old man saw him, so defendant hit him and "took him down." Defendant said that Hilton would not unlock the safe and he "choked" him. Defendant tried to get the safe open for 30 to 45 minutes but could not get it open. Defendant told Fisher that he stole some flat screen TVs from the house and that he gave one to his son.

¶ 21    Fisher further testified that he was subject to a prison sentence of four to fifteen years for the charges pending from the search of his house. In exchange for his testimony, the State offered to reduce the charges to battery, a guilty plea to unlawful possession of a weapon by a felon, and probation.

¶ 22    Shana testified that she dated defendant in the past and had known him for 20 years. She and defendant worked at the Ford union hall and were living together in May 2014. Defendant came home with a flat screen TV and told Shana that he "hit a lick." She said she did not want it,

8

so defendant gave the TV to his son, Jesus LaRosa, Jr. Around that same time, she and defendant were walking on a beach near Navy Pier, and defendant kept repeatedly saying that he "f'ed up" and that he had "choked a guy out." Defendant did not reveal the name of the person, but he mentioned something about a safe.

¶ 23 On cross-examination, Shana stated that "hit a lick" meant that defendant had not legitimately purchased the TV. She admitted that detectives interviewed her on February 20, 2015, shortly after they arrested Fisher on drug charges. During her interview, she denied that she knew Hilton or had any knowledge of his murder. She agreed with defense counsel's statement that she lied to police when she stated that she did not know anything about the murder.

¶ 24 Defendant's son, Jesus, Jr., testified that defendant called him sometime around his birthday, in May 2014, and said that he had a gift for him. Jesus met defendant and Shana at a McDonald's parking lot, where defendant gave him a Vizio TV. The TV had a wall mount bracket, but the attachment for the wall was not in the box. Jesus testified that he eventually gave the TV to his brother and his brother sold it through Facebook. Janice Robinson testified that she bought a 42-inch Vizio TV through Facebook. The parties stipulated that Robinson's boyfriend would testify that Robinson purchased the TV using his Facebook account and that he did not put any mounting brackets on the TV.

¶ 25 Brandon worked at the union hall with Shana and defendant until April 7, 2014. He testified that he quit because the manager did not give him enough hours. Brandon had been living in Indiana since 2011. He denied giving a TV to defendant and Shana. He also denied knowing Hilton. He claimed he did not know him, had never talked to him, and had never been to his house. William Jackson, the president of the local union hall, confirmed that Brandon's last day of work at the hall was April 7, 2014.

¶ 26 Deputy Dan Jungles testified that Robinson and her boyfriend informed him that they purchased the TV through Facebook and that it was the same make, model, and size as the one taken from Hilton's home. The brackets on the TV were also consistent with the hanging attachment on Hilton's wall.

¶ 27 Detective Grozik testified that he conducted interviews with Fisher and Shana in February 2015. He interviewed defendant on March 2 and March 3, 2015. The recording of that interview was played for the jury. He testified that the search warrant he handed defendant during the interview was for his fingerprints and DNA in relation to the investigation into Hilton's death. It included details about the investigation. When Grozik was done interviewing defendant, he did not charge him with murder. Defendant was released to DOC custody and arrested weeks later. Grozik also interviewed Brandon, and he denied being involved.

¶ 28 The parties stipulated that a representative from Sprint would testify that she sent phone records for the account registered to defendant's phone number to investigators. The information from Sprint included call detail records and cell sites. A representative from T-Mobile also sent phone records to investigators for Shana's account. The parties also stipulated that Detective Thomas Omiecinski would have testified that he could not locate any contact or phone calls between Brandon and Fisher; Brandon and Jesus, Jr.; or Fisher and Jesus, Jr.

¶ 29 Rebecca Colwell-Ongenae, a Will County mapping specialist, presented a Power Point map representing calls and cell tower service for defendant's cell phone. It showed that defendant's cell phone connected with a tower 1.96 miles away from Hilton's home on May 9, 2014, and again on May 10. Defendant's cell phone later connected to a tower near Navy Pier on May 11. Later that day, at 5:02 p.m., his cell phone connected to a tower just south of McDonald's at the corner of Fullerton and Cicero in Chicago. Defendant called his son, Jesus, around that time. Shana's cell

10

phone also connected with the Navy Pier tower on May 11, 2014, and later that day it connected to the tower near McDonald's on Fullerton.

¶ 30 The State played two excerpts of defendant's March 2015 interview for the jury. In the redacted video recordings, defendant claims that Shana was involved in Hilton's death and that Shana told him that her brother, Brandon, committed the murder. The detectives tell defendant that Shana and Fisher told police that defendant confessed to killing Hilton. Defendant again denies committing the murder. The detectives also tell defendant that they know he gave his son a TV that was stolen from Hilton's house. Defendant claims that he drove to Brandon's house in Indiana to pick up the TV, that he knew it was stolen merchandise when he loaded it into his truck, and that he told his son it was stolen when he gave it to him. Although prompted several times, defendant never confesses to murdering Hilton. At the end of the recordings, defendant states that he cannot discuss the case anymore because his statements might be incriminating.

¶ 31 The defense called Detective Grozik as its only witness. Grozik testified that he interviewed Brandon at the sheriff's office around 11:30 a.m. on March 3, 2015, while defendant was still in custody. He questioned Brandon for approximately two hours. Brandon told Grozik that he spoke with his sister, Shana, the night before and that she told him the police wanted to talk to him about Hilton's murder. A few hours after Brandon's interview, Grozik released defendant without charging him.

¶ 32 The jury found defendant guilty of all three counts of first degree murder. The trial court denied defendant's motion for a new trial and sentenced him to natural life in prison without parole.

¶ 33 II. ANALYSIS

¶ 34 A. Motion to Suppress

11

¶ 35    Defendant argues that his interrogation statements were made in violation of his right to counsel. He claims that the record shows that Detectives Grozik and Omiecinski continued to question him despite multiple requests for an attorney and that he did not knowingly and intelligently waive his previously invoked right to counsel when the interview was reinitiated hours later.

¶ 36    We review a trial court's ruling on a motion to suppress using a bifurcated standard. *People v. Smith*, 2016 IL 119659, ¶ 43. The trial court's findings of fact are accorded deference and will not be disturbed unless they are against the manifest weigh of the evidence. *Id.* We review *de novo* questions of law and the ultimate determination of whether the motion to suppress should have been granted. *Id.*

¶ 37    Under *Miranda v. Arizona*, 384 U.S. 436 (1966), an individual subjected to custodial interrogation by law enforcement is entitled to have counsel present during questioning to assist in protecting the accused's fifth amendment right against self-incrimination. *People v. Brickhouse*, 2018 IL App (3d) 150807, ¶ 41 (citing *Miranda*, 384 U.S. at 444-45). Whether an accused has unambiguously invoked his right to counsel is an objective inquiry—the relevant question being whether a reasonable person would understand the assertion to be a request for an attorney. *In re Christopher K.*, 217 Ill. 2d 348, 380 (2005). In making a request for counsel, "[t]he defendant need not articulate his desire in the manner of a Harvard linguist," but it must be articulated in a clear enough manner so as to reasonably inform law enforcement that the accused wishes to speak to counsel. *People v. Schuning*, 399 Ill. App. 3d 1073, 1082 (2010) (citing *Davis v. United States*, 512 U.S. 452, 459). If at any time during the interview the accused requests counsel, the police must stop the interrogation until an attorney has been provided or the accused reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

¶ 38      Defendant mentions counsel at three different points in his interrogation. The first instance occurs at 10:57 a.m., before the discussion into Hilton's death begins. As Detective Grozik is gathering defendant's information, defendant asks, "Do I get to speak to an attorney or something because, like, right now nobody's telling me nothin'?" Moments later, Grozik reads defendant his *Miranda* rights. Defendant states that he understands his rights and agrees to discuss the case with detectives without an attorney. In this instance, defendant's statement was a vague inquiry about the case, which referenced an attorney. He did not invoke his right to counsel, ambiguously or otherwise. See *People v. Evans*, 125 Ill. 2d 50, 75-76 (1988) (defendant's statement that "[w]e can take time for [police] to get a [public defender], right?" was a vague and ambiguous reference that did not constitute an invocation of right to counsel).

¶ 39      At 11:35 a.m. defendant again asks if he needs to talk with counsel after he is shown a search warrant that authorized the seizure of biological material for DNA analysis. Defendant asks, "I need a lawyer, though, for all that stuff?" Again, defendant's question did not require investigators to cease the interrogation. Officers are required to cease an interrogation when a person in custody invokes his right to counsel. An interrogation refers to express questioning that officers should know is reasonably likely to elicit an incriminating response from a suspect. See *People v. Jackson*, 374 Ill. App. 3d 93, 106 (2007). In this second instance, defendant attempted to inquire about an attorney while providing standards for DNA and fingerprints based on a search warrant. He was not responding to questions by the detectives. Thus, although defendant's inquiry may be interpreted as a request for counsel, it was not in response to the officers' questions and did not require termination of the interrogation.

¶ 40      However, as both parties agree, defendant clearly and unequivocally invoked his right to counsel at 12:11 p.m. At that point in the interrogation, defendant directly and calmly requested

13

an attorney, not once but twice. Detective Grozik continued to interrogate defendant, raising his voice in frustration and asking defendant to reconsider, before terminating the interview a few minutes later. The trial court found that the statements defendant made after he invoked his right to counsel at 12:11 p.m. were admissible and denied defendant's motion to suppress. We disagree.

¶ 41        Determining whether statements obtained after a defendant invokes his right to counsel are admissible at trial is a two-step process. See *Edwards*, 451 U.S. at 484-85; *People v. Trotter*, 254 Ill. App. 3d 514, 524-25 (1993). The first step is to determine whether the defendant or police reinitiated the interview after the defendant invoked his or her right to counsel. *People v. Mandoline*, 2017 IL App (2d) 150511, ¶ 103 (citing *Edwards*, 451 U.S. at 484-85). The burden is on the State to prove that the accused showed "a willingness and a desire" to renew discussions about the case. *Oregon v. Bradshaw*, 462 U.S. 1039, 145-46 (1983). If the State fails to meet that burden, the defendant's statements are inadmissible. *Mandoline*, 2017 IL App (2d) 150511, ¶ 103. If, however, the State demonstrates that the accused reinitiated the conversation, the analysis proceeds to the second step and the court must determine whether the accused voluntarily, knowingly, and intelligently waived his right to the presence of counsel during further custodial interrogations. *Id.*

¶ 42        Whether a purported waiver was voluntary, knowing, and intelligent depends on "the totality of the circumstances, including the fact that the accused reopened dialogue with the police." People v. Woolley, 178 Ill. 2d 175, 198 (1997). Any waiver must be "unbadgered." *Trotter*, 254 Ill. App. 3d at 525. The defendant's statement must be free and uncoerced, rather than the product of the " 'inherently compelling pressures' " of custodial interrogation. *Id.* at 523 (quoting *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)).

14

¶ 43    In *Trotter*, the defendant invoked his right to counsel during a custodial interrogation. At that point, instead of taking the defendant to a holding cell to wait for his attorney's arrival, officers kept him in an interrogation room. They came into the room repeatedly, asking the defendant if he wanted something to drink or needed to use the restroom. At one point, an assistant State's Attorney entered and asked the defendant if he wanted to make a statement. The defendant said he would make a statement when his attorney arrived. Later, another officer escorted the defendant to the restroom and then spent an hour-and-a-half "shooting the breeze" with the defendant. While that officer was still in the interrogation room, approximately seven or eight hours after the defendant initially invoked his right to counsel, the defendant started to express doubts about his attorney's appearance and indicated that he wanted to talk about the case. The officer re-advised the defendant of his *Miranda* rights. Defendant then made an inculpatory statement. The trial court concluded that the statement was admissible and denied the defendant's motion to suppress. The appellate court reversed, finding that the officers' conduct constituted "coercive pressures" that "erod[ed] defendant's will." *Id.* at 525.

¶ 44    Here, the video recording reveals that Grozik continued to question defendant, urging him to confess and raising his voice, after defendant clearly invoked his right to counsel. After Grozik stopped the interrogation, he left defendant alone in the interrogation room with a copy of the search warrant and the warrant complaint, which contained details about the investigation and relevant evidence linking defendant to the murder. Detective Grozik suggested that defendant read the complaint, and he did. Defendant spent most of his time in the interrogation room reviewing the documents and mumbling to himself. When he asked to make a phone call and to speak to the State's Attorney, officers denied his requests. After a few hours, an officer informed defendant that he could discuss the case with detectives if he waived his right to counsel. At that point,

15

defendant succumbed to the pressure and agreed to reinitiate the interview without an attorney present.

¶ 45     We find these circumstances similar to those in *Trotter*. Detectives used the compelling pressures of interrogation to undermine defendant's will to resist and to compel him speak to them where he otherwise would not have done so freely. Based on the totality of the circumstances, defendant did not voluntarily, knowingly, and intelligently waive his right to counsel when custodial interrogations were reinitiated. Accordingly, the trial court erroneously denied defendant's motion to suppress the statements he made after 12:11 p.m. due to a *Miranda* violation.

¶ 46                                    B. Harmless Error

¶ 47     The State maintains that because the other evidence in this case was strong, the improper admission of defendant's custodial statements was harmless error. The State argues that any inculpatory evidence the prosecution gained from defendant's interrogation was "remarkably minor" and did not impact the jury's decision.

¶ 48     An error is considered harmless where the reviewing court can conclude that, absent the error, the outcome of the trial would not have been different. *People v. Carlson*, 224 Ill. App. 3d 1034, 1041 (1992). The State bears the burden of demonstrating that the trial court's error was harmless beyond a reasonable doubt. *People v Johnson*, 218 Ill. 2d 125, 142 (2005). For harmless error to apply to a *Miranda* violation, we must be satisfied that the improperly admitted incriminating statement did not contribute to the defendant's conviction. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).

¶ 49     Here, there was no physical evidence tying defendant to the murder. Aside from the evidence of defendant's statement that he sold Hilton's TV to his son, the evidence against defendant was circumstantial. Defendant knew Hilton from working at the union hall where Hilton

16

attended monthly meetings. Hilton was known to discuss his finances and show pictures of his house at those meetings. Defendant's cell phone records indicated that he was near Crete, in the neighborhood of Hilton's house, around the time Hilton was murdered. Shana and Fisher testified that defendant confessed to robbing and killing Hilton and that he mentioned Hilton's safe. However, no fingerprint or DNA evidence linked defendant to Hilton's body or the crime scene. While there is certainly evidence to support defendant's conviction, it cannot be said that the evidence was overwhelming. Under these circumstances, where the evidence against defendant was circumstantial, we find it difficult to conclude that his statements that he knew he was going to prison for the rest of his life and that he sold Hilton's TV to his son were not contributing factors in the jury's assessment of his guilt. Thus, defendant's conviction must be reversed and a new trial is required. See *People v. Kent*, 2017 IL App (2d) 140917, ¶ 122 (prejudicial trial error required reviewing court to reverse conviction and remand for a new trial).

¶ 50                                              C. Double Jeopardy

¶ 51        The double jeopardy clause of the United States Constitution prohibits the State from having another opportunity to try a case unless it presented sufficient evidence in the first trial to prove the defendant guilty beyond a reasonable doubt. *People v. Drake*, 2019 IL 123734, ¶ 20. Thus, before remanding for a new trial, double jeopardy requires the appellate court to rule upon the sufficiency-of-the-evidence issue. *People v. Taylor*, 76 Ill. 2d 289, 309 (1979). Retrial is the proper remedy if the evidence presented at the first trial, including any improperly admitted evidence, was sufficient to sustain the defendant's conviction. *Drake*, 2019 IL 123734, ¶ 20. Viewing the evidence in the light most favorable to the State and including defendant's custodial statements to detectives, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Accordingly, the double jeopardy clause does not bar retrial.

17

¶ 52    Because we have concluded that admission of defendant's statements was reversible error and a new trial is warranted on that basis, the remaining issues raised on appeal are moot.

¶ 53                                    III. CONCLUSION

¶ 54    The judgment of the circuit court of Will County is reversed and the cause is remanded for a new trial.

¶ 55    Reversed and remanded.

¶ 56    JUSTICE O'BRIEN, specially concurring.

¶ 57    I specially concur to address the defendant's second contention on appeal, not addressed by the majority, that the trial court erred in striking the defendant's *pro se* motion for substitution of judge as a matter of right.

¶ 58    Section 114-5(a) of the Code of Criminal Procedure provides a defendant with the "absolute right" to a substitution of judge upon the timely filing of a proper written motion for substitution. 725 ILCS 5/114-5(a) (West 2016); *People v. Walker*, 119 Ill. 2d 465, 470 (1988).

¶ 59    The defendant's case was assigned to the trial judge, Judge Sarah Jones, on April 22, 2016. The defendant's *pro se* motion for substitution of judge was placed in the mailbox at the Will County Adult Detention Facility on April 29, 2016. There is also a copy of a letter in the court file, dated April 29, 2016. from the defendant to appointed counsel, informing counsel that the defendant had filed the motion due to time constraints and that the defendant wished counsel to adopt the motion. When private counsel appeared before Judge Jones on May 20, 2016, private counsel stated that he wished to adopt the defendant's motion to substitute. Judge Jones instructed private counsel to take the motion to the presiding judge for a hearing on the motion. The presiding judge struck the motion on the basis that the defendant had appointed counsel when the defendant

18

filed the *pro se* motion and private counsel could not adopt a motion that was filed by a someone who was not a lawyer in the case.

¶ 60　　　　With respect to Judge Jones, the judge who presided over the defendant's trial, the defendant complied with all aspects of the statute. See 725 ILCS 5/114-5(a) (West 2016). While a defendant generally has no authority to file *pro se* motions when he is represented by counsel, see *People v. Hampton*, 2011 IL App (4th) 100219, ¶ 11, the motion to substitute is an absolute right of the defendant. *People v. Gold-Smith*, 2019 IL App (3d) 160665, ¶ 29. The defendant was incarcerated, with limited access to his appointed counsel. Not only did the defendant file the motion *pro se* in order to comply with the substitution statute's time constraints, but the defendant also informed appointed counsel by letter that he was doing so and asked counsel to adopt the motion. The defendant's private counsel adopted the defendant's *pro se* motion upon private counsel's first appearance. Since the provision allowing for the automatic substitution of a judge is to be construed liberally, *Walker*, 119 Ill. 2d at 470-71, I would remand for a new trial on the basis that the motion was improperly denied.