**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 170780-U

Order filed January 13, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0780 Circuit No. 15-CF-2861 |
| ROBERT GOLD-SMITH, | ) ) ) | |
| Defendant-Appellant. | ) ) | Honorable Sarah F. Jones, Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justice Lytton concurred in the judgment.
Justice McDade, specially concurred.

**ORDER**

¶ 1    *Held*:  (1) The State proved beyond a reasonable doubt that defendant offered an individual money with the intent to deter his truthful testimony; (2) the trial court did not err in admitting the 2010 aggravated battery charge; (3) the trial court did not commit plain error by failing to comply with Illinois Supreme Court Rule 431(b); (4) postconviction proceedings are an appropriate vehicle to resolve the ineffective assistance of counsel claim; and (5) there was no prosecutorial misconduct in closing arguments.

¶ 2    In 2015, the State charged defendant, Robert Gold-Smith, with communicating with a witness (720 ILCS 5/32-4(b) (West 2014)) involved in his previous solicitation of murder-for-hire

charge. A jury found defendant guilty; the court sentenced him to four years' imprisonment. Defendant appeals presenting numerous contentions of error. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In 2010, defendant repeatedly struck his now ex-wife in court during their divorce proceedings. As a result, the State charged him with aggravated domestic battery. While awaiting trial on that charge, the State charged defendant with solicitation of murder-for-hire (solicitation). The indictment alleged that defendant solicited Brian McDaniel, a fellow inmate, to kill his ex-wife in exchange for money.

¶ 5        Defendant maintained his innocence, denying he solicited McDaniel. Defendant also argued that McDaniel fabricated a recorded conversation between himself and defendant. Defendant alleged that while wearing a wire, McDaniel asked himself questions and then responded in a whisper. Defendant filed a motion to dismiss the indictment for solicitation based on these assertions.[1] The State argued that "[s]hort of *** maybe some type of affidavit from someone admitting perjury," defendant could not prove the indictment was obtained in violation of due process. The circuit court denied the motion to dismiss the indictment.

¶ 6        McDaniel testified at the solicitation bench trial. He agreed to wear a wire in order to record his conversations with defendant. The recorded conversations were played at trial. McDaniel acknowledged his felony aggravated battery charge was reduced to a misdemeanor because of his cooperation. He also was offered $100 in commissary credit, phone cards, $1000 Crime Stoppers reward, and was released from jail after wearing the wire. McDaniel stated the phone cards did not work, the commissary credit was "lost," and that he never received it. Prior to the solicitation trial,

_____

[1] We may take judicial notice of the record in related cases. See *People v. Glasper*, 234 Ill. 2d 173 (2009).

defendant directed the court's attention to letters from McDaniel to investigators stating that he had not received functioning phone cards and that his commissary credit was misplaced when he was transferred between prisons.

¶ 7     Ultimately, the jury found defendant guilty of solicitation of murder-for-hire; the court imposed a 30-year sentence.[2]

¶ 8     After the State argued that the court should not dismiss the solicitation indictment absent an affidavit admitting perjury, defendant sent a prepared affidavit to his associate Julio Centeno entitled "Declaration of Brian McDaniel." The affidavit stated that McDaniel fabricated the wire recording, perjured himself in front of the grand jury, and detailed the benefits he was promised and received for assisting the State. The affidavit also notes that McDaniel only came forward because the statute of limitations for perjury and obstruction had expired.

¶ 9     During recorded phone calls between defendant and Centeno, Centeno stated the affidavit was a thing of beauty but was concerned that McDaniel would say "this ain't true." Defendant responded that the only thing that mattered was that McDaniel signed the affidavit. If McDaniel detailed the actual plot to frame him and joined their side, that was a bonus. Centeno stated he was going to tell McDaniel "to be honest" about what happened and that he was going to "brainwash" McDaniel before saying he did not mean "brainwash." When summarizing what he was to tell McDaniel, Centeno stated he would indicate that if McDaniel cooperated, there would be "a little something at the end of the rainbow" for him and that federal witnesses get paid "very well" and that there would be something "beneficial all the way around if you get the meaning." Defendant

---

[2] On appeal, a panel of this court vacated defendant's conviction and remanded for a new trial, finding that the trial court abused its discretion in precluding defendant from proceeding *pro se* to file a motion for substitution of judge as a matter of right (725 ILCS 5/114-5(a) (West 2012)). *People v. Gold-Smith*, 2019 IL App (3d) 160665.

told Centeno he had to be careful about that and Centeno acknowledged, "I can't say anything promissory." Defendant responded, "No, no, no, no."

¶ 10    Defendant authored a letter as if he were Centeno, offering McDaniel $50 to meet with Centeno to talk about a "mutual acquaintance." The letter also promised another $50 to $100 when the two finally met to talk. Defendant sent the letter to Centeno and Centeno forwarded the letter to McDaniel after signing it. Centeno also enclosed the $50 deposit for McDaniel's commissary. Testimony at trial establishes that after receiving the letter, McDaniel reached out to prison staff, stating he had been contacted concerning his testimony about defendant. Law enforcement began an investigation leading to the charge at issue in this appeal.

¶ 11    About a month after receiving the letter, McDaniel called Centeno. Centeno asked McDaniel if he would read and possibly sign a prepared affidavit to aid defendant. Centeno then traveled to the prison to see McDaniel, but prison personnel denied him access because of his own criminal history.

¶ 12    McDaniel and Centeno again talked over the phone. McDaniel stated that he would sign "anything [Centeno] wanted" but wanted to know what his incentive was. Centeno stated he could not promise anything, but said defendant was going to file a federal lawsuit and that "federal witnesses get paid really well." During this conversation, McDaniel stated defendant had offered him $5000 to kill his ex-wife and that defendant had made the same offer to other individuals. Specifically, McDaniel stated that there was a phone recording of defendant soliciting a former inmate to kill defendant's ex-wife. The call "was thrown out because [defendant] had a good lawyer." McDaniel also stated that defendant had punched his ex-wife in court and, again, stated defendant attempted to hire more than one individual to kill her. McDaniel stated he was not going

to sign anything unless compensated. Centeno responded by saying, "I don't think he's going to want you to sign it now."

¶ 13    McDaniel then reached out to Centeno again via phone. He told Centeno that he had changed his mind and requested the affidavit so he could sign it. McDaniel, again, talked about how defendant had struck his ex-wife in court. McDaniel stated that defendant had Centeno "fooled" and implied that as long as defendant's ex-wife would not be harmed, he would sign the affidavit. Centeno attempted to explain that defendant was on "meds" and that was the reason for defendant's actions toward his ex-wife in court. McDaniel responded that he knew the "meds" defendant was on, that "everybody has been on those," and that those medications "don't make you do that." After the call, Centeno sent McDaniel the affidavit.

¶ 14    In 2015, the State charged defendant with communicating with a witness. The indictment stated that defendant "indirectly communicated with McDaniel with "the intent to deter" him from "testifying freely, fully, and truthfully to a pending matter *** by offering him a thing of value [money]."

¶ 15    Prior to trial, the Sate filed a motion to present evidence of defendant's 2010 aggravated battery charge and solicitation charge to show motive and intent.[3] Defendant only objected to the admission of the aggravated battery charge. The court granted the State's motion.

¶ 16    During *voir dire*, when explaining the principles of a fair trial set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), the court failed to inquire whether the potential jurors understood and accepted the principle that if defendant failed to testify it could not be held against

---

[3] Defendant was awaiting trial on both of these charges during the proceedings at issue here. He does not raise an argument addressing whether it was error to admit evidence of a pending charge as opposed to a conviction.

him. The court also asked whether the jury pool understood and accepted the other principles but then only required the pool to respond as to whether they disagreed with those principles.

¶ 17        At trial, the evidence showed that Julio Centeno was an associate of defendant. The State submitted the communications, both written and recorded, between McDaniel and Centeno into evidence. A copy of the letter defendant authored, offering McDaniel money, was retained by Centeno for his records and entered into evidence. Centeno handwrote a notation at the bottom of the letter stating, "WRITTEN BY ROBERT GOLD-SMITH[,] SENT TO ME."  Also submitted was a letter found in defendant's cell written by defendant to Centeno asking Centeno to contact Rick Sutton, one of the "snitches,"[4] to recant his statements against defendant while reminding Centeno that he previously gave Sutton $100. The letter also requested that Centeno explain to Sutton "that the combination of him, his friend Rick Bauer and McDaniel as snitches looks bad in the cumulative." Further, the affidavit sent to McDaniel and recorded conversations between defendant and Centeno were admitted. Counsel for defendant did not object to or request the redaction of any of the abovementioned evidence.

¶ 18        Centeno testified that he could not remember if defendant asked him to send a letter to McDaniel and that he drove out to meet McDaniel at the prison without direction from defendant. Centeno stated he put the $50 on McDaniel's commissary account out of "common courtesy" and not at the behest of defendant. The defense rested without presenting any evidence.

¶ 19        During closing arguments, without objection, the prosecutor stated,

---

[4] Testimony at trial established that a "snitch" is "a slang word for somebody who tells on somebody else" or "wears a wire." See also Black's Law Dictionary (11th ed. 2019) (defining a "snitch" as "[s]omeone who informs or tattles; especially, one who supplies law-enforcement officers with information in hopes of receiving lenient treatment[.]").

"You hear on the telephone [Centeno] and McDaniel speaking, and McDaniel is like-and [Centeno] says oh, you got $100, you go this, you got that. And McDaniel is like no, I didn't. And [Centeno] kind of takes a step back and goes, well, that's what the document says. That's what Mr. Gold-Smith's truth says. But that's not the truth."

¶ 20    The jury found defendant guilty of communicating with a witness; the court sentenced him to a consecutive four-year sentence. Defendant filed a posttrial motion alleging the trial court erred by admitting evidence of his 2010 aggravated battery charge, which the court denied.

¶ 21    Defendant appeals.

¶ 22                                  II. ANALYSIS

¶ 23    Defendant argues (1) the State failed to prove beyond a reasonable doubt that he offered McDaniel money with the intent to deter McDaniel's truthful testimony; (2) the trial court erred in admitting the 2010 aggravated battery charge; (3) the court committed plain error by failing to comply with Rule 431(b); (4) trial counsel provided ineffective assistance of counsel; and (5) prosecutorial misconduct in closing arguments.

¶ 24    The State argues (1) the evidence proved guilt beyond a reasonable doubt; (2) the trial court's admission of the 2010 aggravated battery charge was proper, or in the alternative harmless error; (3) there was a failure to comply with Rule 431(b), but there was no plain error; (4) trial counsel's deficient performance did not prejudice defendant; and (5) there was no prosecutorial misconduct in closing, or in the alternative it was not plain error.

¶ 25                          A. Communicating with a Witness

¶ 26    Under this heading, defendant's arguments revolve around the way in which the State decided to pursue the charge. Specifically, defendant argues it is undisputed that Centeno not

defendant was in contact with McDaniel. Thus, the State needed to pursue an accountability theory and instruction at trial. The gist of defendant's argument is that the State conflated different *actus reus* elements in the statute to argue, in essence, an accountability theory. Defendant also argues he cannot be held accountable for Centeno's actions because they were not criminal.

¶ 27 The State argues it showed defendant acted through an agent in committing the offense and a natural reading of the statute prohibits direct and indirect offers of money. Alternatively, the State contends that there is "no question that defendant offered money to McDaniel." Also, that there was sufficient circumstantial evidence presented to find that defendant intended for McDaniel to falsify his testimony.

¶ 28 "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35. A defendant's challenge to the sufficiency of the evidence requires a reviewing court to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt regardless of whether the evidence is direct or circumstantial. *People v. Jackson*, 2020 IL 124112, ¶ 64. A criminal conviction will not be overturned on a challenge to the sufficiency of the evidence unless "the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 29 A defendant's intent to deter a witness from testifying freely, fully, and truthfully can be inferred from the circumstances of the case. See *People v. Woodrum*, 223 Ill. 2d 286, 316 (2006) ("Criminal intent is a state of mind that is usually inferred from the surrounding circumstances."). Evidence of an attempt to bribe a witness allows an inference of guilty knowledge. *People v. Perry*, 21 Ill. App. 3d 18, 23 (1974). Evidence that the defendant offered a witness money to sign an

affidavit containing false information is sufficient to support a conviction for communicating with a witness. See *People v. Henderson*, 2019 IL App (4th) 170305, ¶¶ 18-20.

¶ 30    The section of the Criminal Code (720 ILCS 5/32-4(b) (West 2014)) under which defendant was convicted states,

> "A person who, with intent to deter any party or witness from testifying freely, fully and truthfully to any matter pending in any court, *** forcibly detains such party or witness, or communicates, directly or indirectly, to such party or witness any knowingly false information or a threat of injury or damage to the property or person of any individual or offers or delivers or threatens to withhold money or another thing of value to any individual commits a Class 3 felony." *Id.*

¶ 31    We agree with the State that there is sufficient evidence to support the assertion that defendant directly offered money to McDaniel with the intent to deter him from fully, freely, and truthfully testifying. Contained in the record is a letter authored by defendant making McDaniel an offer of money with a promise of additional funds to follow. Although Centeno signed and forwarded the letter along with some of the promised funds, we fail to see how this detracts from the fact that defendant made McDaniel an offer of money. This removes the need for the State to pursue an accountability theory. Given that we have found defendant directly made an offer of money to McDaniel, we need not address his claims regarding statutory construction.

¶ 32    Turning to the required intent, the circumstances in this case allow for an inference that defendant intended to deter McDaniel from testifying freely, fully, and truthfully. The phone conversations between Centeno and McDaniel evidence that McDaniel believed his testimony was true and was only willing to change his testimony if compensated upfront. McDaniel's comments

asserting the veracity of his testimony were repeatedly ignored. Defendant stated to Centeno the only thing that mattered to him was that McDaniel signed the affidavit. The fact that defendant authored the affidavit before even attempting to initiate contact belies the assertion that he was only attempting to obtain McDaniel's truthful testimony. Instead, it appears defendant was only attempting to obtain McDaniel's signature on the affidavit. Additionally, the language in the affidavit stating that McDaniel came forward owing to the lapse of the statute of limitations is not why McDaniel would have signed the affidavit as he made clear his desire to receive compensation. There was also the conversation between Centeno and defendant and Centeno and McDaniel that there would be "a little something at the end of the rainbow" for McDaniel if he cooperated.

¶ 33    Defendant argues, *ad nauseum*, that he was only attempting to get McDaniel to tell the truth. It is axiomatic that the jury was not required to believe this theory. See *People v. Evans*, 209 Ill. 2d 194, 212 (2004). The State presented sufficient evidence for a jury to infer beyond a reasonable doubt that defendant intended to prevent McDaniel from testifying freely, fully, and truthfully. Viewing the evidence in the light most favorable to the State, a rational trier of fact could find the essential elements of the charge beyond a reasonable doubt. The evidence is sufficient to support defendant's conviction.

¶ 34                          B. Evidentiary Ruling

¶ 35    Defendant argues the admission of the 2010 aggravated battery charge was prejudicial and in no way probative to the charge pending against him. He contends the charge was only used to show his propensity to commit crimes and that the admission was not harmless.

¶ 36    The State avers admission of the 2010 charge was proper because it established motive and intent. Alternatively, the State argues any error was harmless because (1) the evidence of

- 10 -

defendant's guilt was overwhelming and (2) the 2010 charge was rarely mentioned and did not impact the jury's decision in finding defendant guilty of communicating with a witness.

¶ 37    Other-crimes evidence is admissible if it is relevant for any reason other than to show defendant's propensity to commit crime. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). Among other things, evidence of past crimes can be used to show intent and motive. *Id.* at 136. We will not reverse the decision of the trial court regarding the admissibility of other-crimes evidence absent a clear abuse of discretion. *People v. Chapman*, 2012 IL 111896, ¶ 19.

¶ 38    The lower court did not err in admitting the other-crimes evidence. Defendant argues this is classic propensity evidence and the State wanted the jury to conclude that because defendant battered his wife in 2010, he then tried to hire McDaniel to murder her, and subsequently asked McDaniel to lie about it. We find this argument unpersuasive. As correctly argued below, the aggravated battery charge was used to show intent and motive of defendant. Also, there is no indication that the aggravated battery charge became the focus of defendant's trial. See *People v. Chambers*, 2011 IL App (3d) 090949, ¶ 19. The evidence of the prior assault on the ex-wife was probative of defendant's criminal intent. See *People v. Chapman*, 2012 IL 111896, ¶ 33; *People v. Illgen*, 145 Ill. 2d 353, 366 (1991). There is no indication that the lower court's order was arbitrary, fanciful, or unreasonable. The trial court's ruling did not constitute an abuse of discretion.

¶ 39    Even assuming error on the part of the lower court in admitting the other-crimes evidence, we agree with the State that the admission of the evidence was harmless. In a harmless-error analysis, the State bears the burden of persuasion to prove beyond a reasonable doubt that the result would have been the same without the error. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). As the State points out, the aggravated battery charge pales in comparison to the

solicitation evidence to which defendant did not object. Further, the evidence in this case establishes defendant's guilt beyond a reasonable doubt.

¶ 40                                C. Rule 431(b)

¶ 41        Defendant argues the trial court erred by failing to ask jurors if they understood several of the principles codified in Rule 431(b), commonly known as the *Zehr* principles (*People v. Zehr*, 103 Ill. 2d 472 (1984)), along with failing to mention one of the principles altogether. Defendant did not preserve this argument but asks for plain-error review. He asserts the evidence was closely balanced where there were two competing explanations for the same series of events.

¶ 42        "The trial court must ask each potential juror whether he or she understands and accepts each of the principles in [Rule 431(b)]." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The rule mandates a specific question and response process. *Id.* The State concedes the lower court erred in admonishing the jury pool on the *Zehr* principles. Nonetheless, the State argues the evidence was not closely balanced.

¶ 43        To determine whether the evidence is closely balanced, we must conduct a qualitative, common sense assessment of the totality of the evidence within the context of the case. *People v. Sebby*, 2017 IL 119445 ¶ 53. Evidence is closely balanced when the State and defense witnesses presented two plausible opposing accounts of events and no extrinsic evidence corroborated or contradicted either version, so that the conviction necessarily rested upon a credibility contest. *Id.* ¶¶ 61-63. The evidence is not closely balanced when there is evidence supporting one version of events or a version of events is implausible. *People v. Olla*, 2018 IL App (2d) 160118, ¶ 35 (citing, *e.g.*, *People v. Effinger*, 2016 IL App (3d) 140203).

¶ 44        The evidence in this case is not closely balanced. A review of the record makes clear that defendant was offering McDaniel money with the intent to deter his truthful testimony. There was

- 12 -

no credibility contest in this case as the defendant did not put on any evidence. There is evidence supporting the State's version of events; defendant's version of events is implausible. The error does not amount to plain error and defendant's forfeiture must be honored.

¶ 45                          D. Improper Closing Argument

¶ 46        Defendant argues the prosecutor misrepresented the evidence in closing arguments. Specifically, defendant argues the State committed prosecutorial misconduct when it argued statements in the affidavit were untrue because McDaniel denied receiving $100 commissary credit to testify against defendant when the State was aware of what McDaniel was offered. Defendant acknowledges he did not preserve this argument and asks for review under both prongs of plain error. The State argues there is no error as defendant cites the statement complained out of context. Even if there was error, it does not amount to plain error because the evidence was not closely balanced.

¶ 47        A prosecutor has wide latitude in closing arguments and may comment on a witness's credibility and challenge the theory of defense when those remarks are based on the evidence or reasonable inferences therefrom. *People v. Kliner*, 185 Ill. 2d 81, 154 (1998); *People v. Pope*, 284 Ill. App. 3d 695, 706 (1996). Even when the prosecutor's comment exceeded the bounds of proper argument, "the verdict will not be disturbed unless the remark caused substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on defendant's right to a fair and impartial trial." *People v. Johnson*, 208 Ill. 2d 53, 115 (2003).

¶ 48        Again, the complained of comment in closing consisted of recounting Centeno and McDaniel discussing what McDaniel *received* for his assistance in the prior case. Specifically, the prosecutor stated, "[Centeno] says oh, you got $100 you got this, you got that. McDaniel is like

- 13 -

no, I didn't. And [Centeno] kind of takes a step back and goes well, that's what the document says. That's what Mr. Gold-Smith truth says. But it's not the truth." However, defendant takes this comment out of context as immediately preceding this comment the prosecutor stated,

> "Now let's move on to the third proposition, that the defendant is trying to deter Brian McDaniel from testifying truthfully and fully. The declaration of Brian McDaniel, the truth according to [defendant]. But who wrote the truth? Who wrote Mr. McDaniel's truth? [Defendant] did. He wrote this document. You don't hear on the telephone calls Julio saying hey Brian, just tell the truth, we need you to get up there and testify truthfully, okay. No, we need you to sign this document that was drafted before we even ever spoke to you on the telephone. Because this is the truth. No. Use your common sense. What are they trying to do?"

¶ 49　　Defendant focuses on the complained-of comment in isolation but when viewed in context of the entire argument, it is clear that the prosecutor was pointing out the fact that despite McDaniel's repeated denials as to the truth of the affidavit, defendant and Centeno continued to prod him to sign the affidavit. This repeated disregard for what McDaniel claimed to be true only supports the State's theory of the case that defendant was attempting to prevent McDaniel from testifying freely and truthfully.

¶ 50　　Further, the prosecutor was simply restating the evidence presented at trial. McDaniel in his phone conversations with Centeno, as pointed out by the prosecutor, denied *receiving* certain benefits. A review of the transcript from the solicitation trial also shows McDaniel stated the phone cards did not work, the commissary credit was "lost," and that he never *received* it. Defendant referenced letters during the solicitation case McDaniel sent to investigators claiming he did not

- 14 -

receive these benefits. The State never denied that McDaniel was offered certain benefits for his cooperation, instead latching on to his repeated assertions that he did not receive certain of those benefits.

¶ 51       Moreover, the jury was instructed that counsel's closing arguments were not evidence and that only they were the "judges of the believability of the witnesses and of the weight to be given to the testimony of each of them." In light of these circumstances, we cannot conclude that the prosecutor's statements based on the evidence amounts to plain error.

¶ 52       The prosecutor's comment was based on the evidence and was not improper. As there was no error, there can be no plain error.

¶ 53                               E. Ineffective Assistance of Counsel

¶ 54       Finally, defendant argues counsel was ineffective for failing to request redaction of the State's exhibits. Specifically, the recorded phone conversations between McDaniel and Centeno, as well as the letter from defendant to Centeno discussing Rick Sutton and the other "snitches." He asserts the exhibits contained statements that were inadmissible, irrelevant, and prejudicial. In alleging the recorded phone conversations were inadmissible, defendant asserts that the State violated his rights under the confrontation clause where the recordings of McDaniel containing testimonial hearsay statements were admitted without McDaniel himself testifying. He also alleges that in the cumulative errors by counsel deprived him of a fair trial.

¶ 55       The States concedes defense counsel should have redacted the exhibits, claiming an objection regarding the now complained-of content would have likely been successful at trial. More to the point, the State asserts the statements and exchanges in the recorded phone calls were "as defendant contends *** inadmissible and/or irrelevant." Regarding the letter concerning Rick Sutton, the State admits "there does not appear to be a benefit for the defense in allowing the jury

to learn defendant went through essentially the same procedure with a man named Rick Sutton as he did with Brian McDaniel." However, the State submits the deficient performance by counsel was not prejudicial because the evidence against defendant was overwhelming.

¶ 56    In order to succeed on a claim of ineffective assistance of counsel, defendant must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish prejudice, the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the results of the proceedings would have been different. *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 53.

¶ 57    We are not confined by the State's concession of error that counsel was deficient. Regarding the recorded statements from McDaniel, in closing argument the defense argued to the jury, "Where's Mr. McDaniel? Where's his testimony that that affidavit is false? We didn't hear that. So they get up here and say [the affidavit] is a lie. Well, you don't know that. There was never any testimony, no evidence put forth that what was in that affidavit was untrue."

¶ 58    It is apparent from defense counsel's closing that failing to object to the introduction of the recordings on confrontation grounds may have been a matter of trial strategy. See *People v. Manning*, 241 Ill. 2d 319, 327 (2011) ("Matters of trial strategy are generally immune from claims of ineffective assistance of counsel."). In deciding to only have the recorded conversations of McDaniel presented to the jury instead of both the recordings and in-person testimony, defendant and his counsel may have made a decision to mitigate damaging testimony, while at the same time attack the ability of the State to establish falsehoods contained in the affidavit. Of course, the record on appeal does not contain the facts necessary for us to determine whether the failure to call McDaniel was a matter of trial strategy. Ergo, this claim is best resolved on collateral review where

defendant can establish a record with the facts necessary for deciding the ineffective assistance claim concerning the recorded statements of McDaniel. See *People v. Williams*, 2019 IL App (3d) 160412, ¶¶ 34, 37.

¶ 59        Turning to the written letter, defendant concedes that a portion of the letter describing the need for "clandestine" communications and speaking in "code" is "arguably relevant." Nonetheless, defendant argues that it was objectively unreasonable for defense counsel to allow the State to present the rest of the letter to the jury, "where it was only marginally relevant but enormously prejudicial." We disagree. In light of the other evidence submitted at trial, the content of the letter is not of the character that there is a reasonable probability absent its introduction into evidence, the result of the trial would be different. Defendant argues that based on the letter, the jury could have implied that he solicited Sutton to murder his ex-wife. The letter itself rebuts this contention where it states, "I'm facing life for some dumb shit, *not so much for what [Sutton] did*, but because Brian McDaniel made a bogus tape." The letter also supports Centeno's testimony and defense counsel's assertion in closing that giving money to inmates to open up the lines of communication is "customary."

¶ 60        Moreover, there is a portion of the letter that discusses hiring a "audio-forensic" expert to review McDaniel's wire recording, further supporting his theory of the case that McDaniel fabricated the recording and he was only attempting to procure the truth. Given the totality of the evidence, the admitted relevant nature of the letter, and plain statement that McDaniel was the reason defendant was in prison, the admission of the letter did not impact the outcome of the trial.

¶ 61        We also find unpersuasive defendant's argument that the cumulative errors of counsel resulted in an unfair trial.

¶ 62                                      III. CONCLUSION

¶ 63        For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 64        Affirmed.

¶ 65        JUSTICE McDADE, specially concurring:

¶ 66        I concur in the decision of the majority in full as it reflects our clear understanding of the Illinois Supreme Court's precedent on the issues before us. I write separately, however, to again reiterate (1) my concerns on the pervasive use of other-crimes evidence at trial and (2) my belief that the failure of a trial court to comply with Supreme Court Rule 431(b) threatens the integrity of the criminal trial.

¶ 67        The Admissibility of Other-crimes Evidence

¶ 68        Certainly, other-crimes evidence may be admitted for any purpose other than "to show the defendant's criminal propensity." *People v. Bochenek*, 2020 IL App (2d) 170545, ¶ 56. Such *permissible* purpose may be to establish a defendant's intent and motive. *Id.* "However, even if the other-crimes evidence is offered for a permissible purpose, it may nevertheless be precluded if its prejudicial effect substantially outweighs its probative value." *Id.* As the majority concludes, evidence of Gold-Smith's prior assault on his ex-wife may be probative of his criminal intent. *Supra* at ¶ 38.

¶ 69        However, other-crimes evidence presents the jury with possible additional criminal allegations against the defendant. Such evidence inevitably suggests a propensity toward criminal activity. This suggestion relies entirely on allegations that are yet unproven and remain so until a trial is held on each. It is, therefore, difficult to properly assess or measure their prejudicial effect.

¶ 70        The Failure to Comply with Rule 431(b)

¶ 71        I concur in the rule 431(b) decision of the majority because I understand that the result is compelled by the current supreme and appellate court precedent set out in the judgment. I write

separately to reiterate my belief that the failure of a trial court to comply with Supreme Court Rule 431(b) threatens the integrity of the criminal trial and, therefore, the integrity of the criminal justice system of our state. It should always be automatic reversible error.

¶ 72 If you were involved in any kind of consequential competition, you would not want the outcome of the contest to rest on the judgment and calls of persons who are not familiar with, do not thoroughly understand, and have not committed to follow the basic rules of the contest. And if you lost on a close call, you would never accept that defeat as valid because the one making the calls is not demonstrably knowledgeable and trustworthy.

¶ 73 As momentous as these events may be, their impact—fame, fortune, medals, bragging rights—pales in comparison to that in play in the adversarial contest in our criminal courts. In those courtrooms the stakes are, on the one hand, closure, punishment, and a measure of vengeance for victims and their families and, on the other, the liberty and life of defendants. Even in a state such as ours where the death penalty is no longer on the table, life is still very much in issue. Ten, twenty, thirty of your most vital years gone. And if you are one of the far-too-many people proven to have been wrongly convicted in our courts, the inherently devastating effect is compounded by the sheer injustice of your conviction and a sentence of even one day of incarceration for a crime you did not commit.

¶ 74 In the instant case, as in all cases tried to a jury, the sifting, assessing, and weighing of evidence, the determination of guilt or acquittal rests in the hands of 12 people, most of whom enter the jury pool without legal training or experience and without real knowledge of the basic principles that guide how their decision should be made. They, unlike umpires, referees, and line judges, have not had workshops and clinics or opportunities to gain experience at lower levels of

competition before they make it to the championship level. For many, perhaps most, jurors this service is a one-shot deal.

¶ 75    In discharging this critical civic duty, they are asked to apply concepts which are fundamentally counterintuitive. ("Of course this guy is not 'innocent'. Didn't the police investigate this crime? As a result wasn't he charged and brought in here to stand trial?")  or ("If he knows stuff that shows he didn't do it, why doesn't he just tell us? That's what I would do. If he doesn't, there probably isn't anything that helps him because he probably did it.") That kind of thinking is *normal*; it is up to the court to make sure they understand that no matter how logical or sensible such thoughts seem, they cannot be allowed to insinuate themselves into the trial because it destroys the adversarial process on which our assessment of justice depends.

¶ 76    Every criminal jury trial presents the trial judge with the previously described weighty and grave consequences for both victims and defendants, the same counterintuitive standards for reaching a just verdict, and fact finders who lack training and experience for their daunting task. It is therefore imperative that the judge follow the rule's primary directive and give these instructions properly. If that is not done, none of us—not the judge, the attorneys for the parties, the defendant, or those of us sitting on courts of review—can have real confidence that the trial was fair and the verdict is just.

¶ 77    The requirements of rule 431(b) (Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) are clear. It states:

> "(b)  The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the

defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

> "*The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section*." (Emphasis added.)

The single "Committee Comment" that follows the statement of the rule reinforces its actual focus, observing:

> "The new language is intended to ensure compliance with the requirements of *People v. Zehr*, 103 Ill.2d 472 (1984). *It seeks to end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law*." (Emphasis added.)

In this case, the trial court did exactly what that "Committee Comment" tells us that the language of the earlier version of the rule was modified to tell it *not* to do.

¶ 78    In this case, the trial court failed to inquire whether the potential jurors understood and accepted the principle that if Gold-Smith failed to testify, the jury could not hold it against him. A defendant's failure to testify relates to his fifth amendment right against self-incrimination. The trial court's failure to inquire on the principle undermines this constitutional guarantee. Additionally, although the court asked the potential jurors whether they understood and accepted the other *Zehr* principles, the court only required the pool to respond as to whether they disagreed

with those principles. The court's inquiry on those principles to the jurors as a pool is a far cry from questions designed to encourage the juror to actually consider whether he or she really understands what the principle means and how it operates when witnesses are testifying and physical evidence is being produced, and to ask for an explanation if the juror has any questions about how it works.

¶ 79 The Illinois Judicial Benchbook on Criminal Law and Procedure suggests that one appropriate way to frame each question would be: "Do you understand and accept that the defendant is presumed innocent of the charge(s) against him?" A question in this form addressing each of the four principles, while still disappointingly *pro forma*, does *something* to encourage the potential juror to actually focus on his or her degree of understanding of the concept, to consider what it means to "accept" it, and to ask questions if he/she has any doubt.

¶ 80 In this case, the trial court's error was compounded because trial counsel failed to preserve this issue for review. That failure had the effect of shifting this court's focus away from the serious procedural errors that defendant has sought to appeal and into a "plain error" analysis which ought, ideally, not be the driver of our decision on the trial flaws he has alleged and on which almost inevitably, as happened in this case, the defendant will lose. Trial counsel's failure to act competently in this regard clearly prejudiced the defendant, just not in the manner required by our courts. He was prejudiced because we, unlike the jurors who would have made the assessment at trial, have extensive legal training and experience that lead us to conclude, incongruously considering the existence and stated importance placed on rule 431(b), that being properly instructed on the rules guiding how they hear and weigh evidence could not have changed the outcome of the trial.