**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190606-U

Order filed February 7, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Grundy County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0606 Circuit No. 19-CM-38 |
| ERIC BRANDT, | ) ) ) | Honorable Sheldon R. Sobol, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice Hauptman concurred in the judgment.
Justice McDade specially concurred.

**ORDER**

¶ 1     *Held*:  (1) The circuit court's failure to properly admonish the venire under Rule 431(b) was not reversible plain error, and (2) the State did not commit clear or obvious error in closing arguments.

¶ 2     The defendant, Eric Brandt, appeals following his conviction for domestic battery. He

contends that the Grundy County circuit court erred in delivering the admonishments required

under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and that the State committed

prosecutorial misconduct in closing arguments.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged the defendant with domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)). The information alleged that the defendant struck Kara Kunz about the face, thereby knowingly causing bodily harm. The matter proceeded to a jury trial on August 13, 2019.

¶ 5        During *voir dire*, the court advised multiple panels of the venire of the principles of law contained in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). After reading the principles to each subset of the venire, the court asked some form of a follow-up question. To multiple groups, the court asked if "[a]nybody *** ha[d] a problem" with the propositions or if anyone "disagree[d]" with the propositions.

¶ 6        During the evidentiary phase of the trial, Kunz testified that she was dating and lived with the defendant on the date of the incident in question. Kunz and the defendant began quarreling as soon as Kunz woke up that day. The defendant indicated that he wanted to end the relationship, and Kunz encouraged him to do so. Kunz then moved toward the dresser with the intent of removing defendant's belongings. As she did so, the defendant "attack[ed]" her. Kunz described the attack: "I remember him throwing me on the bed. He started punching me in the face, hitting me all over. He muffled it, and then he eventually stopped."

¶ 7        Kunz "got up" and began throwing the defendant's belongings outside the apartment. The defendant retrieved his belongings, brought them back inside, then punched Kunz in the face. Realizing that she was bleeding, Kunz walked outside. She observed "there was blood everywhere" and that it was coming from her lip. Kunz went back inside the apartment to shower and prepare to drive to the hospital. While she was in the shower, police arrived at her door.

2

¶ 8        The State introduced into evidence photographs depicting a significant gash in Kunz's upper lip. Other photographs entered into evidence show significant amounts of blood on snow-covered pavement outside Kunz's apartment.

¶ 9        After speaking with a police officer, Kunz was transported to the hospital, where she received "three or four" stitches in her lip.

¶ 10       On cross-examination, Kunz agreed that the argument that precipitated the defendant's attack was a continuation of an argument that began the night prior. The argument began when Kunz called the mother of the defendant's "other two children" to inform her that the defendant had left those two children "with a complete stranger." Kunz agreed that the stranger had actually been living with her and the defendant for one or two months.

¶ 11       Kunz conceded that she could not "remember everything that happened" during the incident. Kunz and defense counsel engaged in the following colloquy:

> "[DEFENSE COUNSEL]: You initially told the officers you didn't want to sign a complaint against [the defendant], correct?
>
> [KUNZ]: Yes, because I was scared.
>
> Q: At the hospital you changed your mind, correct?
>
> A: Yes."

Kunz agreed that she made a written account of the incident in which she reported that the defendant headbutted her. She tacitly agreed that the written statement did not include the fact that the defendant "muffle[d] [his] punches." Kunz testified that her written report was accurate.

¶ 12       Kunz agreed that in a petition for order of protection filed after the incident, she indicated that the defendant had slapped her. Asked whether that statement was incorrect, Kunz replied: "I'm not really sure. All I know is that he hit me with enough force to bust my lip."

3

¶ 13    Deputy Greg Butterfield of the Grundy County Sheriff's Department testified that he was on patrol on the day of the incident. Between 8 and 8:30 a.m., Butterfield responded to a report from an anonymous caller indicating a domestic dispute. Butterfield responded to Kunz's address, where he observed Kunz with "blood from basically right below her eyes, covered her whole face, and onto her shirt." Butterfield also observed "blood spattered all over snow, concrete, blood everywhere" and blood in the hallway of the apartment building. Butterfield apprehended the defendant. The defendant explained the situation to Butterfield. According to Butterfield, the defendant said "[Kunz] was throwing his stuff out, his clothes. He was worried about his stuff getting ruined, so he wrapped her up. And she was trying to get away by pushing and hitting. And he said after that he doesn't remember anything."

¶ 14    Butterfield next made contact with Kunz. He described Kunz as follows: "She was very red, swollen face around the left side of her face. You could see a piece of meat hanging from her lip where she had been cut." Butterfield asked Kunz if the defendant had hit her with an open or closed fist. She replied that she did not know. Kunz was initially uncooperative because she did not want the defendant to go to jail. However, after Butterfield told her that he would sign the complaint himself, such that the defendant would still go to jail, Kunz admitted that the defendant had punched her. Butterfield took photographs of Kunz and called for an ambulance.

¶ 15    Butterfield also photographed the backs of the defendant's hands. He observed that "at the back of his *** right hand, he had a tooth mark right on his knuckle where it would be consistent with someone that punched somebody through the lip and went into their tooth." The photographs, admitted into evidence, show one or two cuts or injuries to the knuckles of the defendant's right hand.

4

¶ 16    A photograph taken by Butterfield of the defendant in a holding cell later that day, also submitted into evidence, show scratches on the defendant's face, some redness on the bridge of his nose, blood in his left eye, and an abrasion next to that eye. Butterfield described the photograph as depicting "[d]efensive marks." Butterfield noted that the defendant told him "the blood in the white of his eye was from a fight the week before."

¶ 17    On cross-examination, Butterfield testified that he interviewed Kunz at the hospital. During this conversation, Kunz "was adamant that she wanted to sign a complaint." Butterfield testified that while talking to Kunz in the hospital he "got the impression *** that there was something going on with child custody."

¶ 18    Deputy Jason Flores of the Grundy County Sheriff's Department testified that he arrived at Kunz's apartment after Butterfield. The defendant had already been placed into custody. Flores also observed blood on the ground at the scene. He later spoke to Kunz at the hospital, where she told him that the defendant had punched her, causing what Flores described as a "significant laceration" to her lip.

¶ 19    On cross-examination, Flores testified that Kunz was concerned about the impact of the incident on her custody dispute with the defendant. The following colloquy ensued:

> "[DEFENSE COUNSEL]: Isn't it true that it became clear to you that she wanted to press charges against [the defendant] because she didn't want her son taken away?
>
> [FLORES]: She had made that statement.
>
> Q: Isn't it true that she also stated that she believed if she signed the complaint she would get custody of her son and not [the defendant]?
>
> A: Yes."

5

¶ 20        The defendant testified that he had one child with Kunz and two other children with a different mother. The day before the incident in question, Kunz called the mother of the defendant's other children and falsely reported that the defendant had left their children with a stranger. This was the catalyst for a quarrel that would continue into the next morning.

¶ 21        That morning, the defendant informed Kunz that he was leaving and not coming back. Kunz became agitated and told the defendant to take his belongings with him. When the defendant moved to exit the bedroom, Kunz blocked him from getting to the door. Kunz began shoving the defendant as well. The defendant testified that he did not respond, adding, "I was not trying to fight with her. I was just trying to leave." The defendant eventually made his way to the living room. However, every time he attempted to get to one of the apartment's two exit doors, Kunz would lock it. The defendant noted that this continued for 5 or 10 minutes.

¶ 22        The defendant finally left the apartment, though he did not "know exactly how [he] even got out." Kunz then began throwing his belongings out of the apartment. The defendant retrieved his clothes and brought them to the communal laundry room in the apartment building, but Kunz continued to throw those clothes outside. After attempting to retrieve the clothes a number of times, the defendant told Kunz he would just leave. Per the defendant, Kunz replied, "bitch, you're going nowhere." Kunz then blocked the door to the outside.

¶ 23        The defendant described what happened next:

>            "I walked up to her and I stuck my hand out like this with my left arm and my left hand (indicating), and I shoved it into her face not trying to physically harm her but maybe just move her out of my way so I could get out. I was at the point where nothing was going to get solved."

The court then clarified:

6

"I just wanted to indicate, so we have a clear record, the defendant has palm open and extended away from him in a flat manner and indicated he put that into the victim's face."

The defendant denied making a closed fist. He testified that he believed there was no other way to escape the apartment building than to do what he did. He did not intend to hurt Kunz. When he noticed Kunz was bleeding, he tried to help her inside.

¶ 24 The defendant entered into evidence three photographs which he testified were taken the following night, after his release from jail. Those photographs show the defendant with a blackened left eye and some bruises on the left side of his neck.

¶ 25 On cross-examination, the defendant denied attacking or punching Kunz. He denied telling Butterfield that he "lost track of [his] memory."

¶ 26 During its closing argument, the State addressed the fact that Kunz had been initially hesitant to tell Butterfield what had happened. The State explained that Kunz was scared and not in a good frame of mind. The State concluded: "After gathering herself, [Kunz] made a statement at the hospital. After considering this, she went into more detail with the statement. The statement—ultimately her statement corroborates her testimony."

¶ 27 The jury found the defendant guilty of domestic battery. Pursuant to an agreement between the parties, the court subsequently sentenced the defendant to a term of 12 months' conditional discharge.

¶ 28                                    II. ANALYSIS

¶ 29 The defendant raises two contentions of error on appeal. First, he argues that the circuit court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), in that it did not ascertain whether each potential juror understood and accepted the legal principles

7

enumerated by that rule. Second, he argues that the State committed prosecutorial misconduct by arguing facts not in evidence during its closing argument. The defendant concedes that he failed to preserve each of these claims below, but he requests that we review the issues under the rubric of plain error.

¶ 30    The first step in any plain error analysis is to determine whether a clear, obvious, or plain error was committed. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Where such an error is identified, the defendant must next establish that the error was prejudicial and thus reversible on appeal. *People v. Mitok*, 2018 IL App (3d) 160743, ¶ 8. A defendant may establish the requisite prejudice in one of two ways. First, a defendant may show that he was actually prejudiced by an error because the evidence in the case was closely balanced, such that the error threatened to tip the scales of justice against him. *People v. Sebby*, 2017 IL 119445, ¶ 51. Second, if a defendant demonstrates that the error is so significant as to rise to the level of structural error, prejudice will be presumed. *Thompson*, 238 Ill. 2d at 614-15. With these principles in mind, we turn to the defendant's arguments.

¶ 31                                     A. Rule 431(b)

¶ 32    The defendant contends that the court's inquiries as to whether potential jury members "disagree[d]" with or "ha[d] a problem" with the principles enumerated in Rule 431(b) was insufficient to satisfy that rule's mandate that the court determine "whether [each] juror understands and accepts" those principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The State concedes that the court's method of questioning was in violation of Rule 431(b).

¶ 33    Our supreme court has previously made clear that "[w]hile it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles

8

is error in and of itself." (Emphases in original.) *People v. Wilmington*, 2013 IL 112938, ¶ 32. Similarly, the court here made no inquiry into whether multiple panels of the venire understood each of the Rule 431(b) principles. Accordingly, we accept the State's concession that error was committed.

¶ 34    The defendant argues that the circuit court's error was prejudicial because the evidence at his trial was closely balanced. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. In *Sebby*, our supreme court found the evidence closely balanced where the trial amounted to a credibility contest between equally plausible accounts, neither of which was supported by corroborating extrinsic evidence. *Id.* ¶ 62; see also *People v. Naylor*, 229 Ill. 2d 584, 607 (2008) (citing the "opposing versions of events, and the fact that no extrinsic evidence was presented to corroborate or contradict either version" in finding the evidence closely balanced). The defendant argues that the same is true in the instant case.

¶ 35    Kunz testified that the defendant punched her in the face, resulting in a significant injury to her lip and large amounts of blood. Deputies Butterfield and Flores both testified to the large amounts of blood at the scene. Butterfield described Kunz's wound as "a piece of meat hanging from [Kunz's] lip where she had been cut." The defendant, meanwhile, conceded that he caused Kunz's injury, but testified that it happened when he shoved an open palm toward her face, not intending to hurt her, but merely trying to escape the apartment building.

¶ 36    Initially, these accounts, on their face, are not equally plausible. Kunz's substantial injury and blood loss was much more likely to be caused by a forceful strike than an open-handed shove.

9

¶ 37        More importantly, the defendant's assertion that "neither side offered extrinsic evidence to corroborate or contradict either side's story" is incorrect. First, the photographs showing Kunz's injury and the large amounts of splattered blood at the scene corroborated her, Butterfield's, and Flores's testimony regarding the extent of the injury. Further, the State's photograph showing damage to the knuckle area of the defendant's hand severely undermined his version of events. We also note that the defendant entered photographs showing his blackened left eye the day after the incident, in ostensible support for his account of mutual combat. However, Butterfield's testimony that the defendant told him that he had suffered an injury to his left eye in a prior altercation casts doubt on the notion that the defendant received that injury from Kunz.

¶ 38        In urging that the evidence at trial was closely balanced, the defendant insists on appeal that Kunz suffered from a lack of credibility. Specifically, he emphasizes Kunz's apparent lie precipitating the conflict; the purported inconsistencies between her testimony and her earlier statements; and her desire to gain custody of the child she shared with the defendant.

¶ 39        Our commonsense assessment of the evidence naturally includes an assessment of the credibility of witnesses. *Sebby*, 2017 IL 119445, ¶ 61. The defendant neglects any mention of the credibility issues surrounding his own testimony, specifically, the variations between his initial explanation of events to Butterfield and the account provided at trial. More importantly, the credibility concerns raised with respect to Kunz, even accepted at face value, are of minimal impact given the narrow area of dispute in the present case. The defendant did not dispute at trial that Kunz was a household member or that he caused bodily harm to her. See 720 ILCS 5/12-3.2(a) (West 2018). The only contested question for the jury to resolve was whether the defendant acted without legal justification. See *id.* Based on the trial evidence, that question

10

manifested as a determination whether the defendant struck Kunz with his fist or shoved her face with his open hand. As discussed above, the testimony of Butterfield and Flores, and the photographic evidence, strongly supported the conclusion that Kunz was struck with a fist.

¶ 40      In sum, Kunz's account of the events in question was more plausible on its face than the defendant's account. Moreover, her account was corroborated by testimony from Butterfield and Flores, and by the photographic evidence. Accordingly, we conclude that the evidence at the defendant's trial was not closely balanced, and that the defendant has therefore failed to demonstrate prejudice flowing from the circuit court's Rule 431(b) error.

¶ 41                              B. Prosecutorial Misconduct

¶ 42      The defendant next argues the State misrepresented the evidence in its closing argument "when it stated facts about [Kunz's] written statement that were outside the record." The defendant insists that the prosecutor said that Kunz " 'went into more detail [of the incident] with the [written] statement' she made at the hospital and her written statement 'corroborates her testimony.' "[1]

¶ 43      The defendant's argument relies upon a mischaracterization of the State's remarks. As relevant here, the State argued that Kunz "made a statement at the hospital. After considering this, she went into more detail with the statement. The statement—ultimately her statement corroborates her testimony." In his brief, the defendant's inserts "[written]" into this quotation and proceeds as if the State's argument referred to Kunz's written statement.

¶ 44      Butterfield testified that he interviewed Kunz at the hospital. Thus, Kunz plainly made an oral statement at the hospital. While some references were made to a written statement during

---

[1]The bracketed portions of the above quotation were supplied wholly by the defendant in his brief. The bracketed language is purely an addition; it does not replace other language found in the actual quotation.

11

Kunz's cross-examination, it was never established where or when this statement was given. Thus, it seems apparent that the State's reference to a "statement at the hospital" was a reference not to any written statement, but to Kunz's oral statement to Butterfield.

¶ 45    Our conclusion that the State was referencing Kunz's oral statement in the portions of its argument in question is dispositive, as the defendant's entire argument is premised upon a lack of evidence relating to the written statement. Nevertheless, we note further that the actual argument made by the State was, in fact, supported by the evidence.

¶ 46    Butterfield testified that Kunz was initially reluctant to sign a complaint or provide details of the incident. However, while at the hospital, Kunz was adamant that she sign a complaint against the defendant. Butterfield also testified that over the course of his conversation with Kunz at the hospital he "got the impression *** that there was something going on with child custody." The State's inference that this conversation was more detailed in comparison with Kunz's initial reluctance to even sign a complaint is thus fairly supported by the record. Likewise, while the actual details of the hospital conversation between Butterfield and Kunz were limited, it can be reasonably inferred from Kunz's adamance about signing a complaint against the defendant that she was accusing the defendant of causing the injury for which she was being treated in the hospital. See *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005) ("The State is afforded a great deal of latitude in presenting closing argument and is entitled to argue all reasonable inferences from the evidence.").

¶ 47    We conclude that the State did not commit a clear, obvious, or plain error in its closing argument. Accordingly, we need not proceed further in a plain error analysis.

¶ 48                                III. CONCLUSION

¶ 49    The judgment of the circuit court of Grundy County is affirmed.

12

¶ 50        Affirmed.


¶ 51    JUSTICE McDADE, specially concurring.

¶ 52        I concur in the judgment of the majority. I write separately on the issue raised pursuant to Supreme Court Rule 431(b) to reiterate the reasoning and conclusion set forth in my special concurrences in *People v. Lawrence Webb*, 2021 IL App (3d) 180699-U, and *People v. Robert Gold-Smith*, 2022 IL App (3d) 170780-U.